**RECORD NO. 13-1110**

**IN THE**

# United States Court of Appeals

**FOR THE FOURTH CIRCUIT**

DONALD JENSEN,

*Plaintiff-Appellant,*

v.

WESTERN CAROLINA UNIVERSITY;
UNIVERSITY OF NORTH CAROLINA;
ROBERT MCMAHAN, IN HIS INDIVIDUAL AND OFFICIAL CAPACITITES;
MARY ANN LOCHNER, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES;
JAMES ZHANG, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES;
EARNEST HUDSON, JR., IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION

**OPENING BRIEF OF APPELLANT
DONALD JENSEN**

S. Luke Largess
TIN, FUTON, WALKER & OWEN, PLLC
301 East Park Avenue
Charlotte, North Carolina 28203
(704) 338-1220
llargess@tinfulton.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-1110        Caption: Donald Jensen v. Western Carolina University, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Donald Jensen
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent
       corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                         ☐ YES ☑ NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ S. Luke Largess _____     Date: _____ 2/12/2013 _____

Counsel for: Appellant _____

# CERTIFICATE OF SERVICE
****************************

I certify that on _____ 2/12/2013 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Katherin Murphy
Asst. Attorney General
North Carolina Dept. of Justice
P.O. Box 629
Raleigh NC 27602-0629
kmurphy@ncdoj.gov

S. Luke Largess _____        _____
       (signature)                              (date)

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

JURISDICTIONAL STATEMENT ................................................................1

ISSUES ON APPEAL ..................................................................................2

STATEMENT OF THE CASE........................................................................3

STATEMENT OF THE FACTS ......................................................................5

    A. Appellant Reports The Sexual Harassment Complaints ...........................5

        1. Ms. Patterson Files a Criminal Charge ...........................................7

        2. Ford Claims that Appellant is Behind the Allegations ......................8

    B. Appellant First Four Years At WCU...................................................9

        1. The Departmental Committee's Concern About Scholarship .......10

        2. Concerns about Collegiality and the 2010 AFE ...........................12

        3.  The Meeting with Zhang Regarding the 2010 AFE.....................13

        4. The WVRT Review........................................................................14

        5. WCU Faults Appellant for the Campus Disruption and Begins
           to Defend Against the Charges .......................................................16

           a. Ford Admits the Allegations Are True ................................17

           b. The September 17 Meeting................................................. 17

           c. Lochner Writes to Retract McMahan's Threats .................20

           d. The Administrators Meet to Discuss Appellant's
             Reappointment ...................................................................22

i

6. The Fifth Year Review ...................................................................23

    a. Ball's Dissent Was Necessary to Secure Non-Reappointment ...................................................................24

    b. Appellant Asks Stone and Ferguson for Advice ...............25

    c. Appellant Addresses the Journal Issue ................................27

    d. The College Committee Is Told Appellant Is Non-Collegial .................................................................................28

7. The Two-Pronged Approach to Removing Appellant from WCU ...................................................................................28

    a. The WVRT Reconvenes And Discusses Removing Appellant From Campus ...................................................29

    b. The Attempt to Blame Yates for the Meeting .....................30

    c. Hudson Takes the Dean's Recommendation to Appellant..30

    d. WVRT Meets on February 3 and Discusses Gloria Patterson ............................................................................32

    e. The February 10, 2011 Meeting ..........................................32

    f. Disseminating The Blog Linking Gloria Patterson and Appellant ............................................................................33

8. Landis' Report .........................................................................34

9. Appellant Is Banned From Campus Permanently .........................34

SUMMARY OF ARGUMENT ....................................................................38

STANDARD OF REVIEW ..........................................................................40

ARGUMENT .................................................................................................41

  A. The District Court Erred in Granting Summary Judgment on Appellant's First Amendment and "Whistleblower" Claims..............................................41

  B. The Legal Principles of First Amendment Retaliation are Well Established **...............................................................................................** 41

      1.   The Court Erred in Finding No Causal Connection ...................... 47

      2. The Court Improperly Applied the Case Law on Temporal Proximity ......................................................................................... 49

      3. The Court Misstated the "But For" Causation Standard ................ 51

  C. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON HIS DUE PROCESS CLAIM ..........................................53

  D. THIS COURT SHOULD REINSTATE APPELLANT'S CIVIL CONSPIRACY CLAIMS ...............................................................................60

CONCLUSION .............................................................................................60

REQUEST FOR ORAL ARGUMENT ...................................................61

CERTIFICATE OF COMPLIANCE.........................................................61

CERTIFICATE OF SERVICE ...................................................................62

ADDENDUM OF VERBATIM TEXT OF RELEVANT STATUTE...................63

iii

# TABLE OF AUTHORITIES

## CASES

*Adams v. Trustees of the University of N.C.-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) ...........................................................42

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................40

*Bd. of Regents of State Colleges v. Roth,*
  408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) ................................58

*Brandt v. Bd. of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cnty., N.Y.*,
  820 F.2d 41 (2d Cir. 1987) ...........................................................58

*Constantine v. Rectors & Visitors of George Mason University*,
  411 F.3d 474 (4th Cir. 2005) ....................................................42, 49

*Cox v. N. Va. Transport Commission*,
  551 F.2d 555 (4th Cir.1976) ...........................................................58

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
  145 F.3d 653 (4th Cir. 1988) ...........................................................49

*Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*,
  264 F.3d 424 (4th Cir. 2001) ...........................................................40

*Givhan v. Western Line Consolidated School District*,
  439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979) ....................................52

*Givhan v. W. Line Consolidated Sch. District*,
  439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979) ......................52, 53, 55

*Hensley v. Horne*,
  297 F.3d 344 (4th Cir. 2002) ........................................38, 41, 42, 48

*Higgins v. E.I. DuPont de Nemours & Co.*,
  863 F.2d 1162 (4th Cir. 1988) ...........................................................40

*Hill v. Lockheed Martin Logistics Management, Inc.*,
    354 F.3d 277 (4th Cir. 2004) ...........................................................48

*Huang v. Board of Governors of the U.N.C.*,
    902 F.2d 1134 (4th Cir. 1991) ........................................................51

*Mt. Healthy City Sch. District Board of Education v. Doyle*,
    429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) ....................52

*Newberene v. Department of Crime Control & Public Safety*,
    359 N.C. 782, 618 S.E.2d 201 (2005) .............................................42

*Price v. Thompson*,
    380 F.3d 209 (4th Cir. 2004) ..........................................................50

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ................40

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097,
147 L.Ed.2d 105 (2000)

*Ridpath v. Board of Governors Marshall University*,
    447 F.3d 292 (4th Cir. 2006) .....................................................39, 59

*Sciolino v. City of Newport News, Va.*,
    480 F.3d 642 (4th Cir. 2007) .............................................39, 57, 59

*Suarez Corp. Industrial v. McGraw*,
    202 F.3d 676 (4th Cir.2000) ...........................................................42

## STATUTES

28 U.S.C. §1291 ...................................................................................1
28 U.S.C. §1294(1) .............................................................................1
28 U.S.C. § 1331 .................................................................................1
28 U.S.C. § 1343(a)(3) ........................................................................1
28 U.S.C. § 1367 .................................................................................1
42 U.S.C. §1983 ...........................................................................*passim*
N.C.G.S. § 126-23...............................................................................59

v

N.C.G.S. § 126-23(a)(9) ........................................................................55

N.C.G.S. § 126-23(a)(11) ......................................................................55

## RULES

Fed.R.Civ.P. 56(c) .................................................................................40

# JURISDICTIONAL STATEMENT

Appellant filed this action in the Western District of North Carolina under 42 U.S.C. § 1983, *et seq.* and state law. The District Court had jurisdiction over the federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The Court exercised pendent jurisdiction over the individual capacity state "whistleblower" and civil conspiracy claims against Defendants under 28 U.S.C. § 1367.

The District Court granted summary judgment to Appellees on December 28, 2012. In that Order, the District Court also dismissed without prejudice the state law claims against the two university Defendants on grounds of Eleventh Amendment immunity and declined to exercise supplemental jurisdiction over Plaintiff's defamation claim.

Appellant filed Notice of Appeal on January 25, 2013.

The entry of summary judgment was a final decision that disposed of all of Appellant's claims, conferring jurisdiction on this Court under 28 U.S.C. §1291 and 28 U.S.C. §1294(1).

1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ISSUES ON APPEAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I.      <u>WHETHER THE DISTRICT COURT ERRED IN GRANTING
SUMMARY JUDGMENT TO APPELLEES ON APPELLANT'S
FIRST AMENDMENT CLAIM AND STATE WHISTLEBLOWER
CLAIM</u>.

II.     <u>WHETHER THE DISTRICT COURT ERRED GRANTING
SUMMARY JUDGMENT ON APPELLANT'S DUE PROCESS
CLAIM</u>.

III.    <u>WHETHER THE DISTRICT COURT ERRED IN DISMISSING THE
CIVIL CONSPIRACY CLAIM, GIVEN THE ERROR IN
GRANTING SUMMARY JUDGMENT ON THE OTHER CLAIMS</u>.

## STATEMENT OF THE CASE

Appellant filed this action in Federal Court for the Western District of North Carolina on September 1, 2011, alleging Due Process and First Amendment claims pursuant to 42 U.S.C. §1983 and "whistleblower," defamation and civil conspiracy claims under state law. On September 19, 2011, before any responsive pleading, Plaintiff amended his Complaint to add a breach of contract claim. Defendants filed their Answer on November 4, 2011.

By stipulation, Plaintiff amended his Complaint again on February 20, 2012 to add a Title VII retaliation claim, having received a Notice of Right to Sue from the Equal Employment Opportunity Commission. As part of the stipulation, Defendant filed a short form Answer on March 5, 2012 only as to the portion of the Complaint alleging the Title VII claim.

Defendants moved for summary judgment on August 20, 2012. Plaintiff moved to amend the Complaint to add a Title IX claim on September 17, 2012. Plaintiff also moved to dismiss voluntarily the Title VII claim and, in response to Eleventh Amendment immunity arguments made in Defendants' Motion for Summary Judgment, moved to dismiss without prejudice the state law claims against the two Universities on September 18, 2012.

On November 7, 2012, the District Court denied the Motion to Amend the Complaint to add the Title IX claim and denied the Motion to Dismiss other claims voluntarily.   Plaintiff filed a Motion for Relief from that November 7, 2012 Order as to the claims subject to Eleventh Amendment immunity on November 13, 2012.

The District Court heard oral arguments on the summary judgment motion on December 7, 2012.  It granted summary judgment to Defendants on December 28, 2012, but dismissed without prejudice the state law claims subject to Eleventh Amendment immunity for lack of jurisdiction.  It also declined to exercise pendent jurisdiction over the defamation claim.

Appellant filed Notice of Appeal on January 25, 2013.

## STATEMENT OF THE FACTS

### A. Appellant Reports The Sexual Harassment Complaints

On August 25, 2010, two female student-advisees were waiting for Appellant in his office in the Department of Construction Management at WCU at the end of the school day.    JA 289-91, 298.  One, Gloria Patterson, was in tears, upset because a male teacher, Bob Ford, had been following her for several days and had just grabbed her from behind and squeezed her shoulder.  *Id.*  She was unnerved by his following her and this unwelcome, unexpected contact.  *Id.*  The other student, Michelle Bretz, corroborated that the teacher twice had grabbed her in a similar, unexpected manner recently.  *Id.*

Gloria Patterson's husband, Jack, also a teacher in Construction Management, came from his office and listened to their story.    JA 290.  He wanted to call the police,   JA 298.   Appellant urged him not to, but to look up WCU protocol for reporting such conduct.  JA 291.  They went to Jack Patterson's office, found WCU's sexual harassment policy online with a phone number.    JA 287-88, 299.   Jack Patterson called the number while Appellant stood next to him.   JA 288.

The EEO office is in the legal department's office suite.  JA 321; 338.  Now after 5:00 p.m., Appellee Mary Ann Lochner, WCU's general counsel, answered the phone.  JA 337; 288.  She testified that the caller was very upset that his wife was

being harassed. JA 337-38. She took a message and urged Mr. Patterson to have his wife call Henry Wong, the EEO officer, in the morning. *Id.*

Wong had just replaced Lochner as the EEO officer. JA 334-35 He interviewed Gloria and Jack Patterson the next day, August 26, and also spoke with Michelle Bretz separately. JA 322. Wong's notes show that Gloria Patterson reported that Ford had followed her on August 23 and 24 and then grabbed her from behind on August 25. JA 225-27. This followed another touching incident on August 16. JA 225-26.

Henry Wong interviewed Appellant on August 27. JA 322; 317, 319. Appellant recounted what Patterson had told him -- that Ford had been following her for a couple of days and then grabbed or groped her shoulder on August 25, before she came to his office in tears. JA 228.

Appellees emphasized, and the court found, that the first incident occurred in August, and criticized Appellant for testifying that Ms. Patterson had complained to him about Ford in February 2010 and that he had alerted Zhang to speak with her. JA 683. This finding is contradicted by the entry in Henry Wong's notes that there had been conflicts between Ms. Patterson and Ford in the spring semester, including Ford making offensive comments. JA 226. It is also contradicted by Zhang's concession that Appellant may have told him in the spring that Patterson needed to speak with him, but that she never presented any concerns. JA 256, ¶16.

6

### 1. Ms. Patterson Files a Criminal Charge

Completely independent of Appellant, Gloria Patterson went to the campus police after speaking with Henry Wong on August 26. JA 159-63. WCU campus police Sgt. Randall Terry took down her complaint and reported that Ms. Patterson very upset. JA 159-63. He sent an email to other officers that evening alerting them that Patterson was fearful for her safety on campus after reporting Ford to the EEO office. JA 506. The next day, August 27, Sgt. Doug Hester, took over the case. JA 162. He offered to transport Patterson to the magistrate to take out a warrant for assault, but Patterson wanted to meet first with the department head, Janet Yates, to tell her she was seeking charges. JA 162. Hester later interviewed Yates, who reported to him that Ford was a "loose cannon" who had shown her a "flash of anger" and that she, too, was worried about how he would react to being charged. JA 162.

Patterson obtained a warrant for assault and the police arrested Ford on campus. JA 340. For a student to have a teacher arrested was "very uncommon," JA 339, and doing so on campus was a unique moment in WCU history. JA 378; 453; 472.

The entire management team was notified of the arrest. JA 341. Beth Lofquist, the vice provost and a long time WCU employee, called it "disruptive." JA 453. The faculty was instructed not to discuss it with anyone, including the press. JA 422. The arrest made news in the local newspaper and on television,  JA 344-45; 377-78; 404;

422. Lochner described the coverage as disconcerting to McMahan and Zhang. JA 346. McMahan rued that the press "sensationalized" the story. JA 378. McMahan, and Zhang independently used the same term to describe the television coverage – "ambush" journalism. JA 345; 377; 404.

### 2. Ford Claims that Appellant is Behind the Allegations

In this charged atmosphere, the three member University workplace violence response team ("WVRT") met with Ford on August 30. John Ritchie, the head of student counseling, created typed notes of the interview. JA 507-513. Ford denied the allegations. JA 507, 510. He told the WVRT that he would *never* grab a student's shoulder and denied ever touching Bretz. JA 510 Ford said he did not remember touching Gloria Patterson, but that she would be the *only* student he might touch because he knew her outside of class. JA 510.

Ford then turned the interview into a complaint against Appellant, claiming he was jealous of Ford, wanted him gone, and was behind the allegations. JA 507, 510-11. The WVRT asked if he needed support, and closed its investigation. JA 507, 509 None of these facts about the WVRT investigation and response is reflected in the court's decision.

Two weeks later, Ford would admit that he, in fact, touched the women as they described, JA 323; 373-74, though the WVRT was never told. The reason the WVRT so readily accepted Ford's denial and his complaint against Appellant

8

stemmed from some involvement the WVRT had with Appellant the prior school year.

## B. Appellant First Four Years At WCU

WCU hired Appellant in August 2006 as an Assistant Professor in the Department of Construction Management in the Kimmel School on a seven-year tenure track.   JA 11-12, ¶¶ 10, 11; JA 48, ¶¶ 10, 11.   That position involved an annual reappointment process.   *Id.*   In Appellant's first three years at WCU, his reappointment was recommended unanimously by the departmental review committee, the department head, the dean, and the provost. JA 515-16 (AA-12), 518-20 (AFE); 517 (2nd year letter); 521-24 (3rd year AA-12 and letters).   At the end of his third year, the Annual Faculty Evaluation "("AFE"), JA 525-27,completed by the department head, Brad Sims, rated Appellant's progress as "satisfactory" in the three assessed areas of teaching, scholarship and service, and stated that Appellant "has performed collegially and professionally and is very helpful to others."   JA 527.

Sims left WCU in the summer of 2009 and Appellee Zhang, a full professor in Engineering and Technology and the associate dean of the Kimmel School, became interim department head.   JA 254, ¶ 5   Zhang had served on the

departmental review committee that approved Appellant in the third year.[1]  JA 523,
§7.   Aaron Ball, the other full professor in the Engineering and Technology
Department, JA 492, took Zhang's place on the Construction Management
departmental committee in Appellant's fourth year.  JA 133, 532.  All supported
Appellant's reappointment in the fourth year, including Zhang, Ball and the college
review committee, which routinely reviews the progress of tenure track employees
in their fourth year.  JA 532-33.  There were no concerns listed on the form AA-12
from anyone involved in the fourth year reappointment.  *Id.*

The District Court opinion described some issues that arose in Appellant's
fourth year, nearly all of them arising before Dean McMahan recommended
Appellant for reappointment on February 1, 2010.  In recounting this evidence, the
court omitted some key facts.

### 1.  The Departmental Committee's Concern About Scholarship

The court finds that the department committee raised concerns in his fourth
year that Appellant had published articles in an academic journal that he edited.
Appellant.  JA 674.   The court later finds that department committee member Ball
had that same concern the following year, leading him to vote against

---

[1]    Construction Management was a new department and did not yet have any
tenured faculty, so the departmental review committee was comprised of tenured
faculty from other departments.

reappointment.  JA 683-84.   The record shows, in fact, that all on the committee, including Ball, did not consider the issue worthy of documentation in that fourth year.    JA 137-38; 142-43; 198-99; 263-64.

After the fourth year departmental vote in favor of reappointment, Zhang had drafted a memo detailing his objection to a statement of support from Brad Sims that Appellant had submitted with his dossier.   *Id.*  Zhang circulated this memo by email to the committee members for approval and asked whether he should include anything in it about Appellant's need to publish in other journals. *Id.*.  The committee responded unanimously that the journal issue should *not* be included in the memo but should only be discussed verbally.   *Id.*  Aaron Ball emphasized in an email that the journal issue should *not* be put in writing by the review committee.  JA 138, 143, 199, 264.

The next year, Appellant had done as discussed.  He published two articles in other journals as part of a fifth year resume of scholarship.  JA 564-65.   Ball voted against reappointment, JA 566, §7, though the journal issue not even documented in writing the prior year had been addressed.  This key fifth year vote was not, as the court found, a continuation of a strong concern about ethics, but a change from Ball's opinion in the fourth year.

The court's findings fail to mention another aspect of Appellee Zhang's testimony about the fourth year.   Zhang testified that he discussed with Appellant

11

two incidents involving interactions with other faculty.    JA 675; 255, ¶ 9.   But Zhang testified falsely in deposition that the department committee had discussed these concerns about Appellant.   JA 390-91.   That assertion was unsupported by any other witness or document and left out of his declaration.    The departmental committee had no behavior concerns, in either the fourth or fifth year.

### 2.  Concerns about Collegiality and the 2010 AFE.

The district court opinion recounts in three pages Appellees' evidence of Appellant's conduct in the 2009-10 school year that led Appellee Zhang's to issue a "concern" in the 2012 AFE regarding Appellant's collegiality .  JA 675-77.  The incidents involved two disagreements with a teacher named Ray Godfrey, two disagreement with a teacher named Bob Ford, and Appellant's conversations with Zhang about the failure of another teacher, Ron Mau, to carry his share of the work in editing an academic journal based at WCU.  *Id.*  Zhang admitted however that these concerns, taken together, "absolutely" did not warrant non-reappointment.

> Q.     Let me back up. I asked you
>
> when you wrote the AFE in May of 2010.
>
> A. Uh-huh (affirmative).
>
> Q. Did you think it warranted nonreappointment
>
> on the basis of collegiality?
>
> A. Back at that time?

Q. Right.

A. No, absolutely not.

JA 396, ll. 2 – 9.   A year later, after Appellant helped report the sexual harassment claims, Zhang provided the college level committee that information as grounds for non-reappointment.

Zhang's information included testimony from Appellee McMahan that his secretary had reported to him on  January 25  being afraid of Jensen's behavior in one of the disagreements with Godfrey, JA 678; 180, ¶8. McMahan had this information but still recommended reappointment on February 1, 2010.  JA 537.

The court also described evidence regarding Bob Ford's complaint about Appellant's conduct at a student club meeting.  JA 676-77.  This description omits that Ford had not witnessed the alleged conduct he complained about and later apologized for the conflict.  The court notes that McMahan asked the two men to go out for a drink and work things out, but omits that Ford later e-mailed McMahan to apologize for complaining.  JA 677, 337.  Appellee Lochner, general counsel for WCU, said "it would have been helpful to know" that Ford had apologized for creating that conflict.  JA 337.

### 3.  The Meeting with Zhang Regarding the 2010 AFE

In May 2010 Zhang and Appellant met regarding the AFE and Plaintiff learned of the rating of "concern" regarding Plaintiff's collegiality.  JA 678.   The

13

court recounts Zhang's description of Appellant's demeanor and his request to remove the comment from the AFE when Zhang would not provide specifics. *Id.* Zhang admitted that he did not to provide Appellant the factual basis for the rating. JA 258, ¶24; 397-98.  The Vice Provost testified that it violated WCU policy to issue a poor rating in an AFE category without first identifying an issue in a work plan.  JA 475-77; 480.  A person must be notified in writing about a performance issues before it appears in the evaluation.  JA 475-77.

McMahan and Zhang then met with Appellant and refused again to provide Appellant the specific reasons for the poor rating, JA 258, ¶28, so Appellant asked to see his personnel file to determine if any complaints were in it.   JA 180 McMahan and Zhang felt Appellant reacted so emotionally to their refusal to state the bases for his negative AFE rating that they told Kathy Wong, the head of HR. JA 180-81, 258, ¶27.

### 4.  The WVRT Review

Appellant went to Human Resources (HR) to review his personnel file on May 20. When Appellant finished reviewing his file, Wong asked him to stay and meet with her and two other persons to answer some questions.   JA 230.  Ms. Wong along with John Ritchie, the head of counseling, and Ernest Hudson, a member of the campus police, comprised WCU's Workplace Violence Response Team or WVRT.

The campus police had done a background check.  JA 149, ¶6.  The court noted Hudson's concern that Appellant had a dismissed 2008 assault charge in Buncombe County in his record, but Appellant denied ever being charged with the crime.  JA 679-80.  Appellant explained that he was never arrested on that dismissed charge -- a criminal summons by a tradesman over a dispute at Appellant's home, so he did not consider it being charged with a crime.  JA 244.  The court also found that a faculty member at a prior employer had filed a charge against Appellant, JA 680, although the record shows that the police had investigated a dispute involving Appellant and a person named Gerald Merckel but concluded it  was a "civil matter" and closed the file without charges.   JA156.

The WVRT asked Appellant lots of questions.   Appellant explained in the interview that he simply wanted to know what he had done to deserve the poor rating.  JA 204  They told him to let it go.  Jensen signed the AFE.   Ritchie, the psychologist, had performed a threat assessment and rated Appellant as "low to moderate" risk for aggression or violence. JA 201, ¶5; 205.   Ritchie concluded that Appellant had a good support network, no record of violence at WCU or history of recurring conflicts at WCU, with work as a good, stable influence.  JA 201, 204-05.  He also noted that Appellant "seemed open to our suggestions" and had signed the AFE, so there was "no need for further action" or any recommendation to the administration.   JA, 201, ¶6.   Kathy Wong gave a similar summary of the

committee's assessment.   JA.  230, ¶8.   She and Appellant exchanged emails about the process that she told Hudson and Ritchie was positive.  JA 541.

Appellant worked through the summer and fall of 2010 in good standing. Kathy Wong's testified that in mid-October, when the controversy over the harassment charge was swirling, she reminded others that Appellant had acted appropriately since May 2010.  JA 230, ¶9.  Notes taken at a January 28, 2011 meeting of the WVRT reiterated that Appellant had acted "appropriately" that school year.  JA 572, 438, l. 7.  The *only* controversy regarding Appellant that fall, prior to his departmental committee's fifth-year reappointment vote, was his involvement in the two sexual harassment complaints.

### 5.  WCU Faults Appellant for the Campus Disruption and Begins to Defend Against the Charges

The WCU administration then took steps to defend against the charges and to blame Appellant for the disruption.   McMahan removed Appellant as advisor to the two female students.   JA 327.   Henry Wong consulted with Lochner about Ms. Patterson's allegation and then concluded that Ford had not violated the harassment policy because his actions of following and touching Patterson, even if unwelcome and inappropriate, were not severe and pervasive. JA 218, 324-25.  On or about September 8, Janet Yates, the new department head, told Appellant that he had to meet with Dean McMahan on September 17, 2010, to discuss the students'

allegations.   Wong closed the Patterson investigation on September 10, a week before the meeting.  JA 218.

### a.  Ford Admits the Allegations Are True

Bretz filed her own complaint against Ford on September 2 and Henry Wong interviewed her on September 16, 2010.  JA 218.  Wong interviewed Ford a second time on September 17 about the Bretz complaint.  JA 218.  This time, Ford admitted that he had grabbed both women from behind, by surprise, in the exact manner that they had described, JA 323; 373-74.   No one told the WVRT.

A few days before the September 17 meeting, Yates cautioned Appellant not to testify in Ms. Patterson's criminal proceeding if he knew what was good for his career.  JA 300.  The first setting for Patterson's criminal case was September 28.  JA 510.

### b.  The September 17 Meeting

 McMahan met with Lochner and Henry Wong the evening of September 16 discuss the strategy for the meetings with Jack Patterson and Appellant.  JA 376; 347.  On September 17, he first met with Jack Patterson and then with Appellant.  JA 401.  Yates and Zhang were present at both meetings.  *Id.*   The court's factual recitation picks back up with these two September 17 meetings.  JA 682.

The court found that McMahan called the meeting to find out if there had been a history of harassment, given Gloria Patterson's  "extreme reaction" to "purported"

17

incidents.  JA 682.  Appellant testified, however, that McMahan accused Appellant of not reporting Gloria Patterson's complaint and putting WCU at risk of liability; that he would hold Appellant responsible for Ford's actions; and that he would issue a reprimand.   JA 284-85.   Lochner confirmed Appellants' description of the meeting. JA 347-48.

How Lochner knew what happened is a curious part of the case.  To Janet Yates's surprise, when Appellant left the room after the meeting, Lochner began to talk over the speaker-phone, castigating McMahan for the way he had conducted the meeting.  JA 460-61, 464-466; 280-81.  Yates was describing how legal counsel influenced matters involving Jensen and Jack Patterson that year when this came out in deposition.

> A.    They made strong suggestions to other people
>        during the fall, but not me directly.
>
> Q.    Suggestions about Dr. Patterson?
>
> A.    How to conduct things.
>
> Q.    What do you mean?
>
> A.    I am not positive. But I believe that
>        during the meeting with Patterson and Jensen, they
>        were on the speakerphone.
>
> Q.    This was the meeting in which Dr. McMahan

said: We are going to put something in your file?

A.    Uh-huh (affirmative).

JA 460.  The content of the phone conversation after Jensen left the room left her to believe Lochner had been eavesdropping.

A.    The best I could understand was that she had
      given him specific instructions on how to do the
      meeting.

Q.    The meeting with ... ?

A.    The one with Jack and the one with Don. And
      I guess he didn't follow her instructions exactly.
      She was saying something about: That's not what I
      told you to say. And he goes--Well, they must have
      talked about it ahead of time. And she had told him
      what to say, and he just didn't say exactly, or
      something. I mean, I am getting that just from the
      speakerphone conversation. I was not there, when they
      talked before the meeting.

Q.    I understand.

A.    So I was just piecing it together, from what

19

went on on the speakerphone. I was surprised because

I had not seen that happen.

JA 461.   Counsel for Appellees challenged this testimony, and Yates explained why she believed that Yates was on the phone.   JA 464, l. 9 – 466, l. 11.   *Id.*

Lochner denied listening to the meeting, JA 347, and claimed that McMahan called her. JA 348.  Yates, however, had remained in the room and did not remember anyone making a call.   JA 465.   Lochner agreed that she spoke sternly to McMahan on the phone about how he conducted the meeting, and agreed with Appellant's version of the discussion.  JA 347-48.

McMahan claimed that Appellant was the one who was upset and confrontational during the meeting.  JA 379.   But Zhang was present in the room and testified that everything remained "pretty calm."  JA 403.

### c.  Lochner Writes to Retract McMahan's Threats.

Lochner disputes McMahan's claim that he wrote a letter to Appellant clarify what he stated in the meeting.  JA 181, ¶19, 188.  Lochner admitted that she wrote the letter of September 20, 2010 for McMahan's signature.  JA 350.  In the light most favorable to Appellant, Lochner tried to undo the declarations that she agreed McMahan had made in the meeting.  Specifically, she wrote that Appellant would *not* be held accountable for Ford's conduct and that the letter was *not* disciplinary.  JA 188.

20

Appellant and Jack Patterson met with Janet Yates on September 21, concerned about their future employment at WCU after the September 17 meeting.[2]  JA 301-02, and that Yates arranged for a meeting with the Vice Provost, Beth Lofquist, on October 12, 2010 to discuss their concerns.  Prior to the meeting Lofquist knew about the sexual harassment allegations and Ford's arrest, the most public allegation against a teacher in her career.  JA 471-72.  She had been informed that Appellant was more to blame than Ford for the controversy.  JA 473.

Appellant told her he felt "raked over the coals" by McMahan on September 17 and was worried for his job.  JA 475.   Lofquist agreed that no one should be retaliated against for reporting a student's complaint of harassment.  JA 479.  They also discussed the "concern" in Appellant's 2010 AFE.  Lofquist agreed with him that administrators had to identify specific concerns with a work plan before giving someone a poor rating.  JA 476-77, 480.   She told Yates to develop an action plan that identified any specific collegiality issues that Appellant needed to address.  JA 478.

Lofquist called Lochner after the meeting.  They also discussed "possible management responses" to Appellant.  JA 352-53.  She told Lochner that there had to

---

[2]  Jack Patterson also lost his job and has filed a separate action in the same court, now set for trial on May 28. Case number 2:12-cv-0003.

be a work plan in place to identify performance concerns.  JA 351.  Appellant never heard back from Lofquist and Yates never devised an action plan.  JA 309.

### d.  The Administrators Meet to Discuss Appellant's Reappointment

Loftquist and Lochner's discussion about Appellant was one of several that October.  According to the Appellees' log of privileged communications regarding Appellant, JA, 665. Lochner, Browning, McMahan, Zhang, Yates and Kathy Wong met on either October 12 or 13 to discuss Appellant.  *Id.*  Yates, Zhang, McMahan and Ken Burbank, the Engineering and Technology department head, conferred on October 25, and Hudson sent Lochner an e-mail about a renewed background check of Appellant on October 27 in response to her request that one be done. JA 544; 482.

Lochner disclosed that the October meetings and her email request followed discussions with McMahan and Zhang in August and September about "managerial options" regarding Bob Ford's arrest, the WVRT evaluation of Ford, dealing with "all the parties concerned," and how to respond to the first OCR complaint filed over the controversy.  JA 640-41.

Kathy Wong also testified to the October meeting about Appellant.  The log shows she attended the October 12/13 meeting. By the declaration filed at summary judgment, she corrected her deposition testimony that she had no discussions about Appellant from May 2010 until January 2011.  JA 230, ¶9.  She claimed to have

reviewed her notes and thus recalled discussions with administrators about Appellant. She remembered confirming to McMahan that the May 2010 WVRT investigation of Jensen had been closed without action; confirming "that Dr. Jensen had not engaged in any inappropriate behavior since May 2010;" and recalling Hudson stating that he was trying to find out more background information on Jensen.  JA 230.

Zhang also revealed the content of the discussions that Appellant would not be reappointed.  On October 27, 2010, the same day that Hudson emailed Lochner about the criminal record check, Zhang passed Appellant in the hall and told him that he had better find another job, if he could after all the trouble he had caused.   JA 545. Appellant made a handwritten note that day memorializing Zhang's comment.  *Id*. He authenticated the note in his deposition, JA 380.

These discussions by management about Appellant's reappointment all took place in October, before the departmental committee met to review his dossier.

### 6.  The Fifth Year Review

Appellant submitted his fifth year reappointment dossier in November.   The same three persons who voted for his reappointment in the fourth year were on the departmental panel: Ball, Nuebrander and DeConinck.  The court accepted Appellees evidence that Ball "continued to feel strongly that it was a serious ethical violation for Jensen to continue to publish articles in a journal in which he was an editor. JA 584; 494-96.   Appellant in fact did not "continue" to publish in the AIC as the court

23

seemed to find. He had published two articles in two different, independent journals during his fifth year. JA 564-65. Ball's two committee colleagues noted that accomplishment. JA 140, ¶8; 196, ¶8.

Further, Plaintiff's fifth year resume of scholarship was extraordinary by department standards. JA 551-52, 558-561. He continued to edit the AIC journal; wrote the CM Department's accreditation report; co-authored one successful grant proposal, and co-wrote an unsuccessful one. JA 564-65; 355-360. Appellant had earned five points in that one year under the departments' point system for scholarship, the minimum needed over six years before applying for tenure. JA 551-52, 558-561 (CRD); JA 393-94; 354-57. The expectation was a rolling average of at least one point per year. JA 551-52

### a. Ball's Dissent Was Necessary to Secure Non-Reappointment.

Ball's vote sent the reappointment to the college committee. If the department committee votes in unanimous support for reappointment to a fifth year, that recommendation goes to the dean. JA 385-86, 395, 413. If and only if someone on the department committee votes against reappointment, then the college committee reenters the review process. *Id.* Zhang sat on the college committee; McMahan was the non-voting chair. JA 259,¶34; 182,¶23.

Absent Ball's negative vote, McMahan would have received a unanimous recommendation for reappointment. There was not a single documented reason in the AA-12 record or in Appellant's dossier or personnel file to warrant non-reappointment. The "concern" about collegiality in the 2010 AFE was not specified. The WVRT investigation had been closed without findings. Ball's vote based on scholarship provided the only opportunity for Zhang and McMahan to convene the college committee and create a negative record.

When notified of the dissenting vote, Appellant knew what it meant. He had served on the college committee and knew that the committee conducted fifth year reviews only for non-reappointment. JA 311-12. He was surprised, however, that his scholarship was the excuse. JA 303.

### b. Appellant Asks Stone and Ferguson for Advice

Returning to his office after receiving the AA-12 with the "mixed" departmental vote, Appellant came upon a tenured faculty member in Engineering and Technology, Wes Stone, in the hallway. Appellant asked to speak with him. Another tenured Engineering faculty member, Chip Ferguson, happened by and joined in the conversation. JA 431, ("coincidental" that the three were there). The finding that Appellant approached the two of them is disputed by Ferguson's testimony.

There is disagreement about the tenor of their conversation, but all three agree that Appellant stated that he was being targeted by the administration, that he had

already sought help from the Provost's office (Lofquist) and gotten no response, and that he asked the two men what they thought he should do.  JA 432, 499, 304-08. Appellant's version of the emotional tone of the discussion, however, is consistent with communications about his actions later that day and the absence of any complaints about him over the next two months.

Each of the men spoke later that same day with Ken Burbank, the department head in Engineering and Technology. JA 309, 143, ¶13, 214, ¶13.   Burbank sent McMahan an email, complaining that Appellant had approached Ferguson and Stone "about the upcoming College-level TPR meeting," had "presented his version" of events regarding his "unfair treatment" which was "information that they did not previously know or want to know."  JA 570 .  According to Burbank's e-mail, Ferguson and Stone were concerned that the discussion "might affect their serving on the committee."  *Id.*  Burbank wrote that Appellant also "fished" for information from him.  *Id.*  Burbank did not claim, however, that Appellant had been aggressive or threatening toward Stone, Ferguson or him or hostile about Zhang, as later claimed by Stone and Ferguson.

McMahan e-mailed Appellant, directing him not to contact anyone else on the college level review committee.  JA 571.  He, too, did not claim that Appellant had been aggressive or emotionally inappropriate.  Appellant responded that he did not know Stone and Ferguson were on the committee that year, had not talked to them

for that reason, and would avoid talking with other committee members if given their names. *Id.* The meeting occurred on November 23, 2010. The college committee did not meet until January 26, 2011. No one complained about Appellant's behavior over those two months, as he waited for the college committee to meet. The only concern McMahan and Burbank voiced was that Appellant had contacted committee members to influence the review process.

### c. Appellant Addresses the Journal Issue

In light of the stated concern about publishing articles in the academic journal he helped edit, Appellant prepared a detailed response with letters from other editors that Yates referenced on the AA-12. JA 566-67. She wrote that she was satisfied that Appellant had addressed this concern, the only issue raised b.y the departmental committee, and recommended reappointment. JA 567.

The court found that "the Kimmel School collegial review committee met to consider Jensen's collegiality issues." JA 686. Nothing in the AA-12 or in Plaintiff's record suggested the college committee would meet about any issue other than Ball's concern about the journals. Zhang acknowledged the unfairness of Ball's vote based on Appellant's scholarship. "I can understand the frustration." JA 409. And he acknowledged the cognitive disconnect between Ball's vote and the college committee's discussion about collegiality. JA 410-11.

27

### d. The College Committee Is Told Appellant Is Non-Collegial

The court relied on Stone's affidavit to find that the panel was given information from Yates and Stone and Ferguson.  JA 687   But the summary comment that Stone signed for the committee referred to "multiple breaches" by Appellant "over an extended period of time."   JA 567.  Zhang admitted that he discussed the incidents from 2009-10.  JA 399.  Zhang conceded that he provided the college committee with the kind of specifics that he had refused to provide Appellant when asked for them in May 2010.  JA 397.   He also admitted that he had not investigated the information he was providing to the committee.  JA 398.

Appellees avoided any discussion of Gloria Patterson or Michelle Bretz by the committee, a fact the Court found. JA 687.  It also found that Stone and Ferguson were unaware of the sexual harassment allegations.  *Id.*  Ferguson, however, testified in deposition that the entire faculty received instructions in faculty meetings not to discuss the allegations or Ford's arrest with students or the press.   JA 422.

### 7. The Two-Pronged Approach to Removing Appellant from WCU

The administration moved immediately after the college committee vote to secure Appellant's non-reappointment and discuss how to remove him from campus.

### a. The WVRT Reconvenes And Discusses Removing Appellant From Campus

The WVRT met with McMahan and Zhang on January 28, 2011and began discussing how to remove Appellant from campus. John Ritchie saved hand-written notes of the meeting, JA 572, and read them into the record. JA 435-440. The notes disclose what the committee discussed in detail and the fact that the administration was thinking several steps ahead. Though the dossier review by the dean, provost and chancellor had yet to take place, McMahan had met with the Provost and several others earlier that day and agreed Appellant would not be reappointed. 230-31, ¶11 That fact was Ritchie's first notation after listing the participants. JA 572, 435.

Ritchie's note says that the committee was told that Appellant had reacted strongly to "one negative vote" at the department level and "sought out" two college level review committee members, so that college committee rejected his reappointment. JA 436. Someone noted that Appellant had one additional year of employment upon non-reappointment, and the group candidly discussed ways to remove Appellant from campus before then. JA 436-37.

The first option: Appellant could be "suspended for behavior" issues. But doing that was "difficult because of due process." JA 436. WCU would have to prove "neglect, incompetence or misconduct" at a hearing to suspend Appellant for the duration of his contract. JA 436-37. And that would be difficult to prove because,

"He's been appropriate this year." JA 438.  So the committee discussed other options for removing him, including buying out his contract and ordering a fitness for duty assessment.  JA 437.

### b.  The Attempt to Blame Yates for the Meeting

Appellees claimed that this January 28 meeting was held because Janet Yates called Hudson on January 27 asking for police protection on January 31, the date when she would supposedly present Appellant with the college committee's non-reappointment recommendation.  JA 149-50 ¶11.  Hudson wrote an email to this effect on January 28.  JA 164.  There is no mention in Ritchie's notes that the meeting was called for this purpose.  JA 435-440.  When asked if she ever requested police protection from Appellant, Yates testified that she recalled a faculty member's spouse calling once about concerns about Bob Ford, leading her to call and ask about police availability.  JA 462.  But she never felt afraid of Appellant. JA 468.

### c.  Hudson Takes the Dean's Recommendation to Appellant

On January 31, the Dean signed a letter recommending non-reappointment and Hudson delivered it to Appellant with the AA-12.  JA 150, ¶13.  Again, Appellees claimed this was to protect Yates at her request, JA 164, but the District Court found that Hudson was asked to deliver the letter because of concerns from Ferguson and Stone.  JA 688.  The record does not support that finding.

30

Hudson also presented Appellant with a letter he had signed that warned him to comply with WCU Policy 63 and not to threaten or intimidate anyone. JA 150, 165, 484. Hudson claimed that this letter upset Appellant so that he assigned a plainclothes officer to remain outside the dean's office when he left. JA 484-85. That officer never saw Appellant come near. *Id.*

 Appellant called Kathy Wong, told her he had received the non-reappointment vote and asked who was on the college TPR committee. JA 454-57. She emailed him a link to a web page with that information and he thanked her. JA 455. Wong testified that Appellant pleaded for her to intervene and stated that non-reappointment would destroy his family. JA 456.. Although the court found that Kathy Wong was "very disturbed by the call," JA 689, she described it quite differently in her deposition. Asked if she thought Appellant should be removed from campus because of that statement of concern for his family, Wong responded, "I would not say that, at all." JA 456-57 .

Hudson called Appellant to come to McMahan's office to receive a letter placing him on "investigatory leave." JA 488. Appellant declined the envelope and left campus. JA 488. McMahan and Appellant exchanged emails confirming that Appellant was on investigative leave; Appellant asked for the documentation supporting the non-reappointment. The WVRT met with Lochner, Associate Counsel

31

Shea Browning, Zhang and McMahan later that day to discuss the fact Appellant was on suspended with pay.  JA 579, 441-42.

### d. WVRT Meets on February 3 and Discusses Gloria Patterson.

The WVRT met again on February 3 and discussed removing Appellant as a "safety risk."  JA 580, 442-44.  The court omitted any findings about this meeting. The first meeting notes reveal a lengthy update on the status of Ms. Patterson's claims.  JA 580, 442-43.  She had contacted the WCU Board of Trustees and UNC General Administration and UNC's counsel agreed with WCU's response to her.  *Id.* WCU's Board of Trustees was concerned about the impact of the Patterson matter on students. *Id.*

After discussing how WCU and UNC were dealing with Ms. Patterson, the committee reviewed how it was dealing with Appellant.   They would work on "2 Tracks" to remove Appellant from WCU –the "TPR" track and the "safety risk" track. JA 580, 444.   The committee discussed hiring a forensic psychologist to accomplish that latter task.  *Id.*  It could accomplish the same result as a due process suspension discussed before, but without a hearing.

### e. The February 10, 2011 Meeting

The Committee met again on February 10, 2011.  JA 581, 445-46.  The WVRT had hired psychologist Ed Landis from to come on February 14.  *Id..*   The

32

committee contacted Appellant; he asked for something in writing about the test and asked questions about his situation.  JA 582.  Ritchie's note described Appellant as calm and "non-reactive."  *Id.*  Kathy Wong also recalled that Appellant was calm and had questions about the process.  JA 458.   She sent Appellant an email that day explaining in writing that he had to submit to the exam.  JA 583.

On February 12, 2011, the Provost mailed Appellant her recommendation of non-reappointment, the next step in the TPR process.  JA 584, 501-03.   Appellant requested reconsideration to preserve his internal appeal rights.  JA 503-04.

The psychologist, Landis, met with Appellant on February 14.  JA 587.  His contacts at WCU for information were McMahan and Zhang.   *Id.*  Landis received information that Hudson had gathered from Appellant's former department head at the University of North Florida about some conflict there.  JA 150, ¶15, 591.  Landis later talked with Yates by phone.   JA 587.

### f. Disseminating The Blog Linking Gloria Patterson and Appellant.

On March 1, 2012, while waiting on Landis's report, McMahan sent Lochner, Kathy Wong and Provost Stanford an email with a long post from a blog that criticized the local television station's coverage of the Ford/Patterson trial that same day.  JA 585-86.   The blogger also japed Gloria Patterson, Michelle Bretz and

33

Appellant, asserting that he was using his legal degree to give them legal advice. *Id.* Kathy Wong forwarded the blog post to Chief Hudson and Henry Wong. AJ 585.

### 8. Landis' Report

Landis produced his report in early March. JA 587-600. He concluded that Appellant was a "low to moderate" risk for workplace violence – the same assessment that Ritchie made in May 2010 when the WVRT closed its investigation without action. JA 598, 201, ¶5.. Like Ritchie, Landis found that Appellant had some maladaptive personality traits, but strong social support, a good work history, high level of education, no episodes of proven violence and that he owned no weapons. JA 596, 599. Contrary to the District Court's finding, JA 689, the report did not recommend restricting access to campus.

### 9. Appellant Is Banned From Campus Permanently

WVRT It was faced with the same "low to moderate" assessment of risk as in May when no action was taken. The committee sent a memo to Dean McMahan and Provost Stanford. JA 253.

> After a review of the facts, interviews with involved individuals, and the Workplace Threat Assessment conducted by Dr. Edward Landis, it is concluded that Dr. Jensen has engaged in an on-going pattern of behaviors that are defined as violations of University Policy #63, Workplace Violence. The

team further believes that the findings of the assessment

investigation support disciplinary action including the

suggestion of restricted access to campus.

JA 253.    Contrary to this wording, the committee had not interviewed anyone at

WCU about Appellant's conduct.  Kathy Wong, JA 457. The memo did not state any

findings of fact about Appellant's conduct, and omitted mention of Landis's

assessment of Appellant's safety risk.

McMahan and Provost Stanford accepted the recommendation.    JA ___

Appellant was banned from campus under threat of arrest if he returned.    JA 490.  A

copy of North Carolina's trespass statute was placed in Appellant's WVRT file.  JA

602.

At his deposition, Zhang testified that being banned permanently from a college

campus as a safety threat would dramatically impact any professor's ability to find

work in academia.  JA 405-06.  Zhang believed that a banned person should have

some sort of hearing to challenge that action.  JA 407.

With the "safety risk" prong of dealing with Appellant accomplished by this

March 18, 2011 memo, Appellees moved immediately to complete the second prong

– the TPR process.  Provost Stanford wrote Appellant on March 21, 2011, denying his

request for reconsideration and upholding her recommendation from February.  JA

603    The next day, March 22, 2011, the Chancellor wrote a letter of non-

reappointment.   JA 604   The "2 Track" approach had worked.    Appellant was removed from campus and would never return.

Appellees refused Appellant's requests for a hearing over his banishment from campus the last 18 months of his employment.  Appellee Lochner twice rejected in writing a formal request for a "serious sanctions" hearing.  JA 606-609.  She took the position that Appellant was not entitled to a hearing because he was not tenured and the ban from campus was not a serious sanction.  *Id.*   One of Appellant's demand letters summarized his position that being removed from campus was destroying his career.   JA 611-12.   At deposition, Lochner conceded that Appellant was under contract for a fixed period and covered by the "serious sanctions" provisions of the Code and WCU policy during his fifth and sixth year appointments.  JA 368-70.  She insisted, however, that the term "suspension" in §603 only applied to suspensions *without* pay.  JA 369-70  In fact, §603 reads expressly that any "suspension" must be with full pay -- lasting only until the §603 hearing is held.  JA 574, ¶10. 577, ¶D.6.

After his ban from campus and non-reappointment, Henry Wong testified in Buncombe County state court in a proceeding regarding Michelle Bretz and Robert Ford that Plaintiff had been removed from campus because of his behavior.  JA 329.  Wong testified to that fact without pause.  *Id.*

Appellees also took additional action against Appellant unrelated to any concerns about safety.  They took away an online a summer school graduate level

36

course on construction contracts – CM 659 – that Appellant had designed for WCU and had taught every summer he had worked there.  JA 363-67.  Appellant's student ratings from the 2010 course were exemplary – 3.8 and 3.9 in every category on a 4.0 scale.  *Id.*  February 2011 preregistration data available from the WCU web site listed CM 659 as a 30-seat, full-term summer course for 2011, with Appellant as the instructor.  JA 620-21.   In May, that web information showed 20 of the seats for the class were filled, but Ron Mau was listed as the instructor.  JA 622-23.   In July, mid-summer term, the data shows Mau teaching the class with 20 students enrolled.   JA 624-25.

# SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment on Appellant's First Amendment and "Whistleblower" claims. Appellant reported to a university investigator the sexual harassment complaint of a third party that created a controversy on campus. This report was protected speech under *Hensley v. Horne,* 297 F.3d 344, 347 (4th Cir. 2002). The record shows that his protected speech was a substantial motivating factor in the decisions not to reappoint Appellant to the faculty and to bar him from campus permanently.

The District Court erred in holding: 1) that a non-binding vote against reappointment by a peer committee precluded Appellant from proving that the actions of Appellees before and after that vote were substantially motivated by his protected speech; 2) that the five-month gap between his report of the complaint and the adverse action against him exceeded this Court's standard for temporal proximity; and, 3) misstating the "but for" causation standard that Appellant had to meet at summary judgment in a "mixed motive" case.

The District Court also erred in granting Summary Judgment on the Due Process claim. Appellant was permanently banned from campus while still employed without notice of charges or any opportunity to be heard. Under state law governing Appellant's employment, there is a likelihood that contested information that Appellant had committed workplace violence will be disseminated

38

to prospective employers. Further, the fact Appellant had been banned from campus for alleged misconduct was disclosed publically. Thus, Appellant was entitled to a due process hearing under *Sciolino v. City of Newport News, Va.,* 480 F.3d 642, 649-50 (4th Cir. 2007) and *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006).

Finally, because the District Court incorrectly granted Summary Judgment on these claims, it did so as well with regard to Appellant's civil conspiracy claim.

## STANDARD OF REVIEW

Summary judgment is reviewed *de novo, Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).  It will be affirmed only when the record shows "no genuine issue as to any material fact and that the movant it entitled to judgment as a matter of law." *See,* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To determine whether a genuine issue of material fact exists in this case, the Court must consider the evidence in the light most favorable to Appellant and draw all reasonable inferences from that evidence in her favor. *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 429, 435-36 (4th Cir. 2001).  This Court does determine credibility or weigh the evidence, *id.* at 435, and must disregard any evidence favorable to Appellee that a jury would not be required to believe. *Id.* at 436. *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "That is, [the court] should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves,* 530 U.S. at 151, 120 S.Ct. 2097 (internal quotation marks omitted).

## ARGUMENT

### A. The District Court Erred in Granting Summary Judgment on Appellant's First Amendment and "Whistleblower" Claims.

Plaintiff alleges that his non-reappointment and removal from campus were motivated in substantial part by his role in reporting the sexual harassment complaints of the two female students. That limited role, specifically his interview with the campus investigator, was protected speech under *Hensley v. Horne,* 297 F.3d 344, 347 (4th Cir. 2002). There is substantial evidence that Appellees blamed Appellant for the campus controversy, even after Ford admitted the allegations, and both before and after the departmental vote challenging his scholarship and the college committee's recommendation of non-reappointment. The District Court erred in holding 1) that the college committee's vote determined the issue of Appellees' motive; 2) that Plaintiff could not show temporal proximity between his interview with Henry Wong and his removal from campus and the non-reappointment; and, 3) that he had to prove "but for" causation at summary judgment.

### B. The Legal Principles of First Amendment Retaliation are Well Established

The legal issues on his freedom of speech and whistleblower claims are quite settled. "The First Amendment protects not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th

Cir. 2011), quoting, *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000).   The court below used the following citation to set out the elements of the retaliation claim.

> A plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct. *Id.* at 686.

*Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 499 (4th Cir. 2005).   The court below also correctly held that the same proof requirements apply to the state law "whistleblower" claim,   *Newberene v. Dept. of Crime Control & Public Safety,* 359 N.C. 782, 788, 618 S.E.2d 201 (2005).

It is easy to show, first, that Plaintiff engaged in protected speech.  In *Hensley v. Horne,* 297 F.3d 344, 347 (4th Cir. 2002), this Court held that discussing a third party's sexual harassment complaint with an investigator looking into the claim is speech on a matter of public concern.   That is exactly what happened here.  Plaintiff interviewed with Henry Wong and told him what Patterson's reported about her harassment complaint.  Ironically, the conduct the plaintiff described in *Hensley* is very similar to what occurred here.  The *Hensley* plaintiff told the investigator that the defendant had touched the complaining woman on the shoulder and arm. *Id.* Patterson complained that Ford touched and squeezed her shoulder.

Second, Plaintiff has identified the adverse action – his non-reappointment, his permanent removal from campus, and his post-removal injuries from loss of summer teaching and research assignments.

Third, Plaintiff has shown the causal link between the report and those adverse actions.

The record shows that there were no conduct issues that fall apart from his role in the harassment controversy when the process of non-reappointment unfurled. Zhang admitted that the collegiality "concerns" he referred to in the 2010 AFE were "absolutely not" a basis for non-reappointment. The WVRT query of May 2010 had ended positively without findings or recommendations. And there are admissions against interest that Appellant's conduct was "appropriate" in the fall of 2010 before the non-reappointment process began with Ball's vote.

Then there is the evidence that Appellees blamed Appellant for the allegations and for Ford's arrest and its disruption to the campus. The WVRT accepted Ford's denial of the alleged conduct and his immediate claim that Appellant was behind the charges. McMahan removed Appellant as the women's advisor. Yates cautioned Appellant to stay out of Patterson's criminal proceedings. McMahan then castigated him on September 17 and held him responsible for Ford's actions controversy, statements that Lochner admits McMahan made. When Appellant turned to the Provost's office for help, Lofquist understood that he was to blame for the disruption

on campus.  How more direct can that evidence be?  The administration gathered after that meeting to discuss its management options.   Lochner ordered a renewed background check.  Then Zhang told Plaintiff he had better look for another job.   All of this during a time when everyone agrees that Plaintiff's conduct was appropriate.  The only issue driving these comments and discussion was the Patterson and Bretz controversy and his perceived role in it.

Then there are the true oddities of the negative reappointment votes.  The logic of Ball's departmental dissent was completely strained.   The record contradicts the trial court's finding that Ball was acting out of "continued" and "strong" concern about the journal issue.   He had voted *for* reappointment and *against* documenting the journal issue the prior year.  Plaintiff addressed the journal issue – publishing two articles in two other journals, plus earning five total "points" -- in his fifth year.  That achievement led Ball to question his scholarship?

But the journal issue was the only colorable concern that the department committee had discussed previously other than Brad Sims letter.  Thus it was the issue that Ball could raise to cast the negative vote needed to escalate the reappointment to the college committee.   That Ball's reasoning was a pretext is amply demonstrated by the way in which his scholarship concern was never addressed by the college committee.  It was not an issue; it was an excuse.

44

The District Court failed to consider this evidence about the departmental vote in the light most favorable to Plaintiff. It did not acknowledge Zhang's testimony that the college committee played no role in a fifth year reappointment absent a negative vote at the department level. Thus it accepted Appellees' disingenuous befuddlement that "[a]lthough the committee had voted to reappoint him, Jensen was upset that it was a mixed vote."

Without acknowledging Plaintiff's version if the chance encounter, the District Court relied entirely on Stone and Ferguson's description of their conversation with Appellant when he learned of the mixed vote. The court made findings about Appellant's emotional demeanor. But the administration, including McMahan, looking for behavior issues with Appellant, did not comment or warn Appellant about his demeanor or persistence. He only asked him not to talk with any more of the college committee members. The fact that McMahan and Burbank couched Appellant's happenstance conversation with Stone and Ferguson as him searching out college review committee members shows that they knew the real import of the mixed department vote – a college level committee review.

Though Ball's negative vote was based on scholarship, the District Court finds it perfectly natural that on January 26, 2011, "the Kimmel School collegial review committee met to consider Jensen's collegiality issues." Slip Op. p. 18. In the light most favorable to Plaintiff, the question would be asked, how did that happen if it was

45

not the basis for the departmental dissent?   The court's finding that the committee met for that explicit purpose further shows the pretext in Ball's reason for voting.

The court then placed significant emphasis on the fact that the Patterson and Bretz controversy was not among the collegiality issues discussed.   Given the very real threat of a retaliation claim if it were an explicit basis for the vote, it is not surprising that the committee avoided that ongoing, publicized controversy.   But the Appellees had no reservations about discussing it after the college committee voted on January 26.

A week later, on February 3rd, Zhang, McMahan, and Lochner attended a WVRT meeting to discuss keeping Plaintiff off campus as a safety risk (he had been removed by McMahan and Hudson on January 31).   The first part of that meeting, however, was an update on Gloria Patterson and her recent contacts with the WCU Trustees and General Administration at UNC.   Only after discussing how her matter was being handled, did Appellees and the others turn their attention back to Plaintiff. For all the attention the District Court placed on the college committees avoidance of the harassment controversy, it made no mention of a meeting of the Appellees where Patterson and Appellant were the only two topics of conversation.

Then on March 1, 2011, McMahan sent by e-mail a blog posting about the Patterson-Ford trial that day.   The blog derided the two women and claimed that Appellant was giving them legal advice.  Kathy Wong forwarded the e-mail an blog to

46

Hudson and to Henry Wong.   Within three weeks, the same people on this email exchange would either write or receive the March 18 memo recommending that Plaintiff  be banned from campus permanently, and the Provost would renew her recommendation of non-reappointment.

### 1.  The Court Erred in Finding No Causal Connection

The District Court avoided consideration of all of this evidence that Appellees' were motivated by Appellant's role in harassment controversy  by holding that Plaintiff could not show a causal relation between his report of the harassment complaint and the college review committee's vote against reappointment.   Since the committee members signed affidavits that they did not discuss Gloria Patterson or Michelle Bretz in their deliberations, their vote was not causally connected to the harassment allegations.

The court cites no case law for this concept that the purported innocent motive of a subordinate peer committee that makes a recommendation would shield and prevent inquiry into the motive of superiors who have actual decision making authority.  The closest legal concept to the District Court's approach, the "cat's paw" theory in employment discrimination cases, actually holds the opposite of the position of the District Court – the innocence of a subordinate committee does not protect the employer from liability based of the supervisor's discriminatory animus.

47

> (The Seventh Circuit) developed a "cat's paw" or "rubber-stamp" theory for imposing liability upon an employer for the discriminatory motivations of a supervisor, even though the supervisor did not formally take the adverse employment action. After having been presented evidence that the plaintiff's supervisor was motivated by age discrimination, the court was confronted with the problem that the plaintiff was technically fired by a "Career Path Committee" which was unaware of the supervisor's prejudice. *Id.* at 405. The court held that if the committee "acted as the conduit of [the supervisor's] prejudice-his cat's paw-the innocence of its members would not spare the company from liability." *Id.*

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004).

The main limitation of a cat's paw theory to support the District Court's analysis is obvious.  The notion that a subordinate committees' recommendation would preclude inquiry into the motive of a superior decision-maker can only apply where decision is left to the subordinate.   Here, after the college committee made its recommendation, but then McMahan did as well.  The District Court's notion that proof of the subordinate committee's motive breaks the causal connection between the protected activity and the adverse action seems completely novel in the law.

The District Court's use of the college committee's vote to avoid evidence that Appellees were directly motivated by Appellant's role in the harassment controversy both before and following the college committee's  vote.  The court erred in fashioning this defense to liability.

48

## 2. The Court Improperly Applied the Case Law on Temporal Proximity.

The District Court also erred in holding that there was not sufficient temporal proximity between Appellant's report to Henry Wong in August and his removal from campus in late January and non-reappointment. It failed to find any time parameters in it discussion, but simply cited to the concept that there must be temporal proximity.

The court cited first to *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F. 3d 653, 657 (4th Cir. 1988), where a gap of over three years was too long to temporally connect the protected conduct and the adverse action. The District Court cited to *Constantine* for the principal of temporal proximity. Slip Op. p. 50. That case is almost directly on point and held that four month gap was well within the window of time.

*Constantine* involved several claims, including a First Amendment claim, by a law student whose migraine syndrome disability adversely impacted her during an exam. Her request to retake the test as an accommodation was ignored for several months, leading her to publically challenge the grade appeal process. The school finally agreed to allow her to retake the exam, but then rigidly forced her to do so on a date when she had a class conflict in that semester's schedule. 411 F.3d at 478-79. She filed suit.

49

The defendants argued lack of temporal proximity as a defense to her First Amendment claim.   This Court rejected the argument.

> For three months, the defendants made no response to Constantine's complaints. When they finally agreed to discuss these issues with Constantine, the defendants told her that she could re-take the exam "sometime in June." Then on May 17, 2003, the defendants notified Constantine that she would be allowed to sit for a re-examination on May 21, 2003. At most, four months elapsed from the time Constantine complained about Professor Lund's exam and the grade appeals process to the time of the defendants' alleged retaliatory conduct. Although we noted that a nine-month lapse created a "very close question" as to causal connection in *Price,* we nevertheless concluded that the plaintiff's claim survived a motion to dismiss. 380 F.3d at 213. Likewise, we are satisfied that Constantine's complaint adequately alleges a causal connection between her First Amendment activity and the defendants' alleged misconduct.

*Id.* at 501.  Under *Constantine*, then, there is ample temporal proximity here between Plaintiff's August 27 report and his removal from campus and on January 31.  The District Court erred in finding otherwise.

The trial court's Order expands the time frame of Appellant's claim by referring to his testimony that he first told Zhang in February 2010 that Patterson had complaints about Ford.   The Court finds this testimony wholly unsupported and focuses on it several times.   Appellant responds in two ways.

First, Appellant's testimony that he approached Zhang about Patterson's complaints about Ford is not as incredible as the court found.  Henry Wong's notes from his August 26, 2010 interview of Ms. Patterson do indicate that the first *touching*

50

occurred in mid-August, but also show that she had conflicts with Ford the prior semester, and complained about his comments.   Those notes are consistent with Appellant's testimony.  Slip. Op. p. 15, *Jensen,* pp. 90-93.  And Zhang admitted that Plaintiff may have said something to him in the spring about Patterson.

Second, Appellant's  First Amendment and Whistleblower claims do not turn on communications from the spring, but on the reaction to Plaintiff's undisputed role in helping the two women report their harassment claims in late August – that it was a very negative and substantial factor in his non-reappointment and removal from campus.  *Constantine* holds that the time interval between that speech and the adverse actions s sufficiently compact to make the causal connection.  The court erred in finding otherwise.

### 3.  The Court Misstated the "But For" Causation Standard

Finally, the District Court erred in finding that Plaintiff had to proving "but for" causation at summary judgment.  It relied on *Huang v. Bd. of Governors of the U.N.C.,* 902 F.2d 1134 (4th Cir. 1991) to stated Appellant's burden.  *Huang* involved a six-year lag between the protected speech and adverse action at issue.  902 F.2d at 1140.   But the *Huang* court went on to describe the proof framework for a mixed motive case like this one incorrectly.

> The causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that "but for" the protected expression

> the employer would not have taken the alleged retaliatory action. *See Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979)

*Id.* In *Givhan,* however, the Supreme Court explained quite differently the proof scheme under its then-recent decision in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977),:

> [O]nce the employee has shown that his constitutionally protected conduct played a "substantial" role in the employer's decision not to rehire him, the employer is entitled to show "by a preponderance of the evidence that it would have reached the same decision as to [the employee's] reemployment even in the absence of the protected conduct." *Id.*, at 287, 97 S.Ct., at 576.

<u>Givhan v. W. Line Consol. Sch. Dist.,</u> 439 U.S. 410, 416, 99 S. Ct. 693, 697, 58 L. Ed. 2d 619 (1979). *Huang* misstated this principle of law, but Appellant could still meet that but for standard at the stage.

Plaintiff has shown that his role in reporting the sexual harassment claims was a substantial motivating factor in his non-reappointment and removal from campus. In the light most favorable to him, but for that role and the controversy the allegations created, Professor Ball would have supported his reappointment, as he did the prior year. And, but for Ball's vote, Appellant would not have had a discussion with Stone and Ferguson that Defendants claimed was non-collegial. And, but for Ball's vote, the college committee would never have been involved

and the Dean would have received a unanimous recommendation for reappointment.  And Plaintiff would have been reappointed.

### C.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON HIS DUE PROCESS CLAIM

The District determined the Appellant's 18 month ban from the WCU campus as a "safety threat" did not implicate any constitutionally protected interest entitling him to notice and opportunity for a hearing.  Because there is a likelihood that the fact of that ban and the reason for it will be available to prospective employers, Appellant was entitled to a due process hearing to challenge the ban and its purported.

Defendants' suspended Appellant with pay and removed him from campus on "investigatory leave" on January 31, 2011, and then banned him permanently on March 18, 2011.  The permanent ban was based on the WVRT memo that date to Defendant McMahan and Provost Stanford concluding that Appellant had "engaged in an **on-going pattern of behaviors** that are serious violations of University Policy #63, Workplace Violence.     [And that] "the **findings** of the assessment investigation support disciplinary action including restricted access to campus."  *Id.*  There were, in fact, no "findings" by the committee and the WVRT did not identify at any time which specific acts constituted this "pattern of behaviors."

53

Appellant was suspended from campus permanently and informed he would be arrested if he returned without permission. Appellant was removed of all responsibilities for the remainder of that semester, and then through the end of 2011. His annual, online summer school class was taken away, with loss of income, and his grant based research stipend cut. Thus, he lost income as a result of this ban, not just liberty.

Appellant alleged that being banned permanently for "workplace violence" without any notice of the charges or any right to be heard violated due process.

> Second, the ban from campus for workplace violence violations brands him professionally for the remainder of his professional life and forecloses his opportunity to find other employment. In the future, Appellant will be required to disclose his ban from campus to prospective university or other educational employers. He will have to explain why he has not taught since January 2011. It is now common for employers to ask prospective employees if they have ever been suspended and to state the reasons and be subject to dismissal for untruthful responses. And WCU, in turn will be required to disclose Appellant's purported workplace violence in response to reference inquiries to avoid potential liability, if it truly believes Appellant is a threat. Thus, the ban involves a substantial, damning stigma that impacts future employment opportunities even if not publicized in the media.

JA 36-7, ¶ 252.

In his deposition, Defendant Zhang agreed with this pleading. He testified that a permanent ban from a college campus as a safety threat would significantly and negatively impact any person's ability to find future employment work in

academia. *Zhang. pp. 161-62.* He also felt as an administrator that he would not have done his job correctly if he did not learn that an applicant had been banned from a prior campus as a safety threat. *Id.*

Appellant presented the District Court with N.C.G.S. § 126-23(a)(9) and (a)(11). Those provisions, which apply to WCU and its faculty, *require* public information to be maintained and available about any suspension or termination. The court found this statute inapplicable, concluding that Appellant was not "suspended" because he was paid. Instead, he suffered only "a change in the location where he was to perform the duties of his job." JA 697. But §603 of the UNC Code and §4.09 of the WCU Faculty Handbook require that any "suspension" under those provisions "shall be with pay" pending a hearing. JA 573, 574, ¶10, 575, 577, ¶D.6. So the District Court erred in relying pay status to declare that this statute was inapplicable.

This is not, as the court below declared, a case about a "change in the location of work duties." Appellant clearly was suspended with pay from January 31, 2011 until the end of that term. He was relieved of all duties during that time. The March 18 memo concluded he had committed "misconduct" – engaged in a pattern of behavior that violated workplace violence rules. By law, the fact and dates of that disciplinary suspension are available to the public and to possible employers.

55

He also remained suspended from campus for the duration of his employment, subject to *arrest* if he violated that restriction. He had no teaching assignments at all until the spring term of 2012 – assigned after he filed this lawsuit in September 2011 alleging that he could not explain to a prospective employer why he had not taught since January 2011.

Further, Appellant was clearly "separated" from employment by the Chancellor's March 22 non-reappointment letter issued in the specific context of his permanent, disciplinary ban from campus four days earlier. Defendants expressly tied together the non-reappointment and removal from campus as a "2 Track" approach to Appellant's employment status at WCU. His separation from employment is expressly covered by the statute.

Finally, Henry Wong disclosed in a public hearing that Plaintiff had been barred from campus for his behavior. JA 328. From these facts, Appellant presents three bases for a right to a due process hearing.

First, in the context of the statutory availability of some of this disciplinary information, the UNC Code provides for a full due process hearing before a professor is subject to serious sanctions based on misconduct. Let us not quibble; Appellant was removed from campus due to "misconduct." The March 18 memo describes a "pattern of behaviors" that constituted "workplace violence." The

Code provides for a full due process hearing for such an action because of the likelihood that the information would become public.

This hearing process does not "create" a right beyond constitutional protections; it established a process to avoid the risk of constitutional injury that balances the interest of employer and employee in the manner this Court described in *Sciolino v. City of Newport News, Va.,* 480 F.3d 642, 649-50 (4th Cir. 2007). The Code and WCU policy provide for a hearing for any faculty member subjected to serious allegations of misconduct because of the serious potential for constitutional harm.

Defendants argued, and the District Court agreed, that they had no duty to afford Appellant a hearing because he was not removed for misconduct but as a "safety risk." This proverbial renaming of the rose is quite ironic here. On January 28, Appellees admitted in a meeting that it would be "difficult" to suspending Appellant for the balance of his contract through a §603 hearing because the "due process" protections involved and because his behavior had been "appropriate" that year. Then, without identifying a single act by Appellant, the WVRT concluded that he had engaged in a "pattern of behavior" that amounted to workplace violence under WCU policy. That was a finding "misconduct" under a different label. The "star chamber" quality of the process is also chilling – the WVRT members did not interview anyone on campus about Appellant and then

57

made their recommendation to the very persons they had been meeting with all along regarding Appellant's employment.

Second, even in the absence of the procedures set out in §603 of the Code and §4.09 of the WCU Faculty Handbook, Appellee had a right to a due process hearing under *Sciolino*. It clarified the due process standard for cases where there has not yet been any public disclosure of information. The test is this: what is the "likelihood" that the stigmatizing information that Appellant engaged in workplace violence will be disseminated to a prospective employer.

> A public employer who fires (or refuses to rehire) an employee in a manner that sullies the employee's good name and restricts his future employment opportunities deprives him of important liberty interests protected by the Fourteenth Amendment. *See Roth,* 408 U.S. at 573, 92 S.Ct. 2701. When a Appellant alleges that his termination is based on false, stigmatizing charges that are likely to be inspected by prospective employers, he states a claim that the government has deprived him of these liberty interests.

> If prospective employers are likely to see the stigmatizing allegations, an employee must choose between finding future employment and protecting his reputation by not applying for jobs (and thus not risking the release of the stigmatizing allegations). Requiring a Appellant to "wait until he actually loses some job opportunities" would "place him between the devil and the deep blue sea." *Brandt,* 820 F.2d at 45 (internal quotation marks omitted) (adopting the likelihood standard). . . .

> [T]he constitutional harm "is not the defamation" itself; rather it is "the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge." *Cox v. N. Va. Transp. Comm'n,* 551 F.2d 555, 558 (4th Cir.1976). . . .

> We thus hold that an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file.

*Sciolino* 480 F.3d 642, 649-50 (4th Cir. 2007).  The plain language of N.C.G.S. §126-23 creates the likelihood that prospective employers will inspect the file, or demand to see more detail as a precondition to hiring Appellant.

The District Court erred in parsing the statute to hold that its terms do not apply to a faculty member permanently banished from campus under threat of arrest as a disciplinary measure.  The promulgation of §603 of the Code is an acknowledgement by the University of North Carolina of the real likelihood under state law of the disclosure of this permanent disciplinary suspension from the campus of a public university.

Third, there has been disclosure in this case.  Henry Wong impeached Appellant in a court proceeding by verifying that Appellant had been banned from campus because of his behavior.  He did so without hesitation in his managerial role of direct involvement in the sexual harassment complaint at issue and its impact on WCU.  The District Court's concerns about judicial immunity seem off target.  Wong did not say he felt compelled to disclose that information.  That public disclosure triggers the protections of *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006).

59

Appellees' unwillingness to offer a hearing on his removal from campus is a complete puzzle. Their obligation is neither burdensome nor risky. They did not have to provide a pre-deprivation hearing, but could, as they did, suspend Appellant and take the steps necessary to protect the campus community from a perceived risk. But then they must provide a hearing, both because of the likelihood of dissemination of his disciplinary banishment in the future under the statutory scheme, and, here, because of the disclosure occurred in a public hearing.

Appellant had a right to a due process hearing under *Sciolino* and *Ridpath*. The District Court erred in granting summary judgment on that claim.

## D.  THIS COURT SHOULD REINSTATE APPELLANT'S CIVIL CONSPIRACY CLAIMS

The District Court's analysis of Appellant's Civil Conspiracy claim was correct. That claim derives entirely from the existence of the substantive claims that the Court dismissed. It rises or falls with them. Because the District Court's grant of summary judgment as to the First Amendment and Due Process claims should be reversed, so too should the claim of Civil Conspiracy.

## CONCLUSION

The District Court erred in granting Summary Judgment for Defendants. This Court should reverse the Judgment below and remand this matter for trial.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests that the matter be set for oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because the brief contains 13,131 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Respectfully submitted this 3rd day of May, 2013.

<u>s/ S. Luke Largess</u>
S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, P.L.L.C.
301 East Park Avenue
Charlotte, NC  28203
(704) 338-1220
<u>llargess@tinfulton.com</u>
Attorney for the Plaintiff-Appellant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the required copies of the foregoing Opening

Brief of Appellant and Joint Appendix were filed with the Clerk, United States

Court of Appeals for the Fourth Circuit via hand delivery and electronically using

the Court's CM/ECF system which will send notification of such filing upon the

Defendant's counsel:

> Katherine Murphy
> Asst. Attorney General
> N.C. Dept. of Justice
> P.O. Box 629
> Raleigh, NC 27602
> Kmurphy@ncdoj.gov

Respectfully submitted, this 3rd day of May, 2013.

> s/ S. Luke Largess
> S. Luke Largess
> Attorney for the Plaintiff

## N.C.G.S.A. § 126-23
### § 126-23. Certain records to be kept by State agencies open to inspection
### Effective: June 27, 2011

(a) Each department, agency, institution, commission and bureau of the State shall maintain a record of each of its employees, showing the following information with respect to each such employee:

(1) Name.

(2) Age.

(3) Date of original employment or appointment to State service.

(4) The terms of any contract by which the employee is employed whether written or oral, past and current, to the extent that the agency has the written contract or a record of the oral contract in its possession.

(5) Current position.

(6) Title.

(7) Current salary.

(8) Date and amount of each increase or decrease in salary with that department, agency, institution, commission, or bureau.

(9) Date and type of each promotion, demotion, transfer, suspension, separation, or other change in position classification with that department, agency, institution, commission, or bureau.

(10) Date and general description of the reasons for each promotion with that department, agency, institution, commission, or bureau.

(11) Date and type of each dismissal, suspension, or demotion for disciplinary reasons taken by the department, agency, institution, commission, or bureau. If the disciplinary action was a dismissal, a copy of the written notice of the final decision of the head of the department setting forth the specific acts or omissions that are the basis of the dismissal.

(12) The office or station to which the employee is currently assigned.

(b) For the purposes of this section, the term "salary" includes pay, benefits, incentives, bonuses, and deferred and all other forms of compensation paid by the employing entity.

(c) Subject only to rules and regulations for the safekeeping of the records, adopted by the State Personnel Commission, every person having custody of such records shall permit them to be inspected and examined and copies thereof made by any person during regular business hours. Except as provided

63

in subsection (d) of this section, any person who is denied access to any such record for the purpose of inspecting, examining or copying the same shall have a right to compel compliance with the provisions of this section by application to a court of competent jurisdiction for a writ of mandamus or other appropriate relief.

(d) Notwithstanding any other provision of this section, persons in the custody of, or under the supervision of, the Division of Adult Correction and persons in the custody of local confinement facilities are not entitled to access to the records made public under this section and are prohibited from obtaining those records, absent a court order authorizing access to, or custody, or possession.

(e) An attorney investigating allegations of unlawful misconduct or abuse by a Division of Adult Correction employee may request, and shall be provided with, information sufficient to identify the full name or names of the employee alleged to be involved in the misconduct or abuse in the current position of the employee within the Division; or, the last position held by the employee and the last date of employment by the Division. The attorney may not give the offender copies of departmental records or official documents absent a court order authorizing access to, or custody, or possession.

**Credits**
Added by Laws 1975, c. 257, § 1. Amended by Laws 1975, c. 667, § 2; S.L. 2007-508, § 4, eff. Aug. 30, 2007; S.L. 2010-169, § 18(a), eff. Oct. 1, 2010; S.L. 2011-324, § 1.1(b), eff. June 27, 2011; S.L. 2011-145, § 19.1(h), eff. Jan. 1, 2012.

Notes of Decisions (3)

N.C.G.S.A. § 126-23, NC ST § 126-23
The statutes and Constitution are current through S.L. 2013-15 of the 2013 Regular Session of the General Assembly.

**End of Document**    © 2013 Thomson Reuters. No claim to original U.S. Government Works.